IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STEVEN FREDERICK BECK,<br><br>               Plaintiff,<br><br>    v.<br><br>CITY OF PORTLAND, OREGON, and<br>KELLI SHEFFER, individually<br>and in her official capacity,<br><br>               Defendants. | No. CV-10-434-HU<br><br>OPINION & ORDER |

Ted M. Brindle
Cary Novotny
BRINDLE McCASLIN & LEE, P.C.
101 S.W. Main Street, Suite 950
Portland, Oregon 97204

    Attorneys for Plaintiff

David Landrum
DEPUTY CITY ATTORNEY
OFFICE OF CITY ATTORNEY
1221 S.W. Fourth Avenue, Room 430
Portland, Oregon 97204

    Attorney for Defendant City of Portland

/ / /

/ / /

1 - OPINION & ORDER

Jeff S. Pitzer
PITZER LAW
101 S.W. Main Street, Suite 805
Portland, Oregon 97204

Attorney for Defendant Kelli Sheffer

HUBEL, Magistrate Judge:

Plaintiff Steven Beck brings this 42 U.S.C. § 1983 action against the City of Portland and Kelli Sheffer, a City of Portland police officer. Sheffer moves to dismiss the claims against her. All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c)). I grant the motion.

## BACKGROUND

Plaintiff and Sheffer reside in the same neighborhood in Hillsboro. In June 2007, plaintiff "made contact with Lieutenant Kelli Sheffer" while she was off duty, with the intent of "bringing legitimate concerns" to her attention. First Am. Compl. at ¶ 10.

Apparently, at some other later date, plaintiff was driving on SE Reedville Creek Drive, in Hillsboro, when he noted Sheffer, out of uniform, walking on the sidewalk. Id. at ¶ 11. Sheffer stepped off the curb, stopped plaintiff's vehicle from proceeding by walking in front of it, and directed plaintiff to pull his vehicle over. Id. Plaintiff stopped his vehicle because he knew that Sheffer was a Portland police officer. Id.

During "this exchange," plaintiff heard Sheffer state that she had previously "run" Beck's license plate. Id. at ¶ 12. Sheffer then directed plaintiff not to drive his vehicle through the public street, meaning SE Reedville Creek Drive, near her residence. Id. She also accused plaintiff of following two Hispanic young men and

2 - OPINION & ORDER

harassing them in an incident that took place in the latter part of 2007. Id. at ¶ 13.

In July 2008, plaintiff called the City and ultimately spoke with the Independent Police Review (IPR) division on July 8, 2008. Id. at ¶ 14. After receiving a letter from IPR Director Mary-Beth Baptista, plaintiff requested formal mediation of his dispute with Sheffer, including Sheffer's investigating Beck's license plate, her stop of his vehicle, and her direction for plaintiff to stay out of the neighborhood. Id. at ¶ 15.

On August 27, 2008, plaintiff received a letter from Dan Malin, the auditor of the law enforcement data system (LEDS) which confirmed that, for unknown reasons, Sheffer ran plaintiff's license number. Id. at ¶ 16. The letter requested that the Portland Police Bureau provide LEDS with the reason why Sheffer had requested the information. Id.

Plaintiff further alleges that when Sheffer ran his license plate information, it was not part of any assigned duty. Id. at ¶ 18. Additionally, according to plaintiff, the Portland Police Bureau's own policy and procedure materials, specifically Section 310.70, make clear that LEDS is not for public disclosure and should not be accessed for personal reasons. Id. at ¶ 17. Plaintiff alleges that Sheffer illegally ran his personal information for her own personal reasons, in violation of Oregon Administrative Rules 257-015-0060(1) and 257-010-0025(3). Id. at ¶ 19.

On July 31, 2008, plaintiff's neighbor called him to say that a Hillsboro police officer was in plaintiff's driveway. Id. at ¶ 20. The police officer asked the neighbor to confirm that the

3 - OPINION & ORDER

residence belonged to plaintiff, which the neighbor did. Id. Plaintiff arrived home to discover a business card on his back door, with a request that he call Officer Scott Hanley. Id.

Plaintiff learned from speaking with Hanley on the phone that Sheffer, after learning that plaintiff had filed a complaint and requested mediation regarding plaintiff's disputes with Sheffer, reported that plaintiff was involved in a possible stalking situation. Id. at ¶ 21. Sheffer had also reported other alleged facts regarding plaintiff: purported acts of inappropriate conduct by plaintiff, including that a female minor named "Carissa" had expressed that plaintiff made her feel uncomfortable and was stalking her, and a report of another incident where plaintiff allegedly inappropriately approached a minor. Id. Sheffer also had reported to the Hillsboro police that "the situation" with plaintiff had been brought up "several times" in neighborhood association meetings. Id.

Since learning of the foregoing, plaintiff has been extremely emotionally distraught and no longer feels welcome in his own neighborhood. Id. at ¶ 22. He fears that Sheffer's actions have caused him irreparable harm by encouraging his neighbors and their children to shun him as a potential predator in the community. Id. at ¶ 23. He "has had several experiences that lead him to believe that his image in the community has been tarnished since Sheffer began her campaign . . . suggesting that he is a potential predator." Id.

Plaintiff has sought the assistance of his physician due to the emotional and psychological harm he suffered because of Sheffer's actions. Id. at ¶ 24. He has been diagnosed with a

4 - OPINION & ORDER

shingles-related disorder stemming from the stress. Id. He has developed asthmatic-type symptoms and conditions for which he is being treated. Id.

## STANDARDS

On a motion to dismiss, the court must review the sufficiency of the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. American Family Ass'n, Inc. v. City & County of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002). However, the court need not accept conclusory allegations as truthful. Holden v Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992).

A motion to dismiss under Rule 12(b)(6) will be granted if plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" Id. (citations and footnote omitted).

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted). Additionally, "only a

5 - OPINION & ORDER

complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. The complaint must contain "well-pleaded facts" which "permit the court to infer more than the mere possibility of misconduct." Id.

## DISCUSSION

Based on the facts recited above, plaintiff brings three claims: (1) a section 1983 claim against Sheffer; (2) a section 1983 claim against the City; and (3) an intentional infliction of emotional distress (IIED) claim. Sheffer moves to dismiss both of the claims against her.

I. Section 1983 Claim

Plaintiff captions this claim against Sheffer as a violation of his constitutional right to liberty. He alleges:

> Defendant Kelli Sheffer's actions, as described herein, in unlawfully detaining Plaintiff for the duration of the unsanctioned traffic stop, and by further engaging in a pattern of harassment against Plaintiff while acting under color of city authority as a police officer, deprived Plaintiff of his liberty interest and privileges or immunities protected under the Constitution in violation of 42 U.S.C. § 1983.

First Am. Compl. at ¶ 27.

In support of the motion to dismiss this claim, Sheffer argues that the claim has no merit because Sheffer did not act under color of state law and none of the allegations support a claim of deprivation of a federal or constitutional statutory right. Alternatively, Sheffer argues that she is entitled to qualified immunity.

In response, plaintiff affirmatively states that he does not base his section 1983 claim on the independent acts of Sheffer's license plate LEDS search or on her report(s) to the Hillsboro

6 - OPINION & ORDER

police. Pltf's Resp. at pp. 7-8. Thus, the actions relevant to the section 1983 claim are those that occurred when Sheffer stopped plaintiff's car.

In opposing the motion, plaintiff argues that Sheffer unconstitutionally seized him in violation of the Fourth Amendment. To prevail, plaintiff must show that he was deprived of a federal constitutional or statutory right, by a person acting under color of state law. E.g., Mangum v. Action Collection Serv., Inc., 575 F.3d 935, 941 (9th Cir. 2009) (to state 42 U.S.C. § 1983 claim, plaintiff was required to show that (1) action complained of occurred under color of law, and (2) action resulted in a deprivation of constitutional right or federal statutory right).

A. Color of State Law

"[A] defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. . . . Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." West v. Atkins, 487 U.S. 42, 50 (1988) (citation omitted).

It is clear in the instant case that Sheffer was not acting in her official capacity as a Portland police officer or while actually exercising her responsibilities pursuant to state law. However, a police officer may nonetheless act under color of law when he or she "purport[s] or pretend[s] to act in the performance of his . . . official duties." McDade v. West, 223 F.3d 1135, 1140 (9th Cir. 2000).

Several Ninth Circuit cases have considered the question of whether an off-duty police officer has "purported" or "pretended"

7 - OPINION & ORDER

to act in the performance of his or her official duties such that the officer's actions are considered to have been under color of state law. In <u>Huffman v. County of Los Angeles</u>, 147 F.3d 1054, 1058 (9th Cir. 1998), an off-duty sheriff's deputy shot and killed plaintiffs' decedent during a barroom brawl. The deputy was not in uniform and was carrying his personal, off-duty revolver. 147 F.3d at 1058. However, his revolver was loaded with department-issued ammunition and the deputy carried his official identification. <u>Id.</u> When he met the plaintiffs' decedent, whom he did not previously know, in the bar, the deputy did not identify himself as a sheriff's deputy, but instead said he owned an air conditioning company. <u>Id.</u>

At some point, a conversation between the deputy and the plaintiffs' decedent became heated and aggressive, and the deputy left the bar. The plaintiffs' decedent tackled the deputy to the ground. The deputy never identified himself as a police officer and did not issue any commands. He did, however, fire his gun into plaintiffs' decedent's chest, killing him.

On appeal from a jury verdict in favor of the plaintiffs (the victim's parents), the Ninth Circuit explained that "under color of law" means "under pretense of law." <u>Id.</u> at 1058. The court said:

> A police officer's actions are under pretense of law only if they are in some way related to the performance of his official duties. . . . By contrast, an officer who is pursuing his own goals and is not in any way subject to control by his public employer . . . does not act under color of law <u>unless he purports or pretends to do so</u>, . . . . Officers who engage in confrontations for personal reasons unrelated to law enforcement, <u>and do not purport or pretend to be officers</u>, do not act under color of law.

<u>Id.</u> (internal quotations, brackets, and citations omitted; emphasis added).

8 - OPINION & ORDER

In Huffman, the Ninth Circuit noted that the deputy was not on duty and was not wearing his uniform. Although the weapon he carried was loaded with ammunition supplied by the sheriff's department, the weapon was his own. Id. He never identified himself as a police officer and never issued any commands to the plaintiffs' decedent. As a result, the court concluded that he had not acted under color of state law. The deputy clearly did not act pursuant to his official duties and the facts did not support that he did purported or pretended to act as a police officer. Id.

In Van Ort v. Stanewich, 92 F.3d 831 (9th Cir. 1996), a sheriff's deputy, Stanewich, returned to the Van Orts' residence to rob it after having earlier performed, while on duty, a search for illegal drugs. The search revealed no contraband and no charges were filed, but during the search, the officers learned of a safe containing cash, jewelry, and coins.

When Stanewich was off-duty, he returned to the Van Orts' home and entered it, either forcibly or possibly after being recognized by Donald Van Ort. It was undisputed that he did not display his badge and he denied being a police officer.

Stanewich attacked and tortured the Van Orts. But, Donald Van Ort's girlfriend escaped and called 911. The responding police officer entered the home, ordered the intruder to freeze, and shot him when he failed to comply. Upon unmasking the intruder, the officer recognized Stanewich and exclaimed "Mike!" Stanewich responded, "[y]es, it's me, I'm wrong." He then died.

The Van Orts brought suit, including a section 1983 and other claims. In addressing the color of state law issue, the court easily concluded that Stanewich was pursuing his own goals and was

9 - OPINION & ORDER

not in any way subject to control by his public employer. Id. at 838. Although the plaintiffs did not contest this point, they argued that Stanewich used his status and privileges as a law enforcement officer to gain entry to their home and to commit his crime and thus, he acted under color of state law. Id. at 838. The plaintiffs contended that because Stanewich carried handcuffs and a gun and was perceived by Donald Van Ort to be acting as a police officer and allowed to enter the home due to that perception, Stanewich's acts were under color of state law. Id. at 839.

The court recognized that if Stanewich had purported to or pretended to act under color of law, even if his goals were private and outside the scope of authority, he was acting under color of state law. Id. The court further noted that Stanewich could have been acting under color of state law if the Van Orts had been injured during a meeting "related to the provision of services pursuant to Stanewich's County employment," and if Stanewich had used his "'government position to exert influence and physical control' over the Van Orts, particularly if they were 'in awe of government officials.'" Id. (quoting Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476, 480 (9th Cir. 1991)) (brackets omitted).

The court struggled with an unclear factual record, but ultimately concluded that regardless of which version of the facts it accepted, Stanewich had not acted under color of state law. The court rejected the plaintiffs' argument that Donald Van Ort's recognition of Stanewich as a police officer rendered Stanewich's actions under color of state law:

> Merely because Donald recognized Stanewich, however,

10 - OPINION & ORDER

> would not make the attack under color of law. For instance, in Barna v. City of Perth Amboy, 42 F.3d 809 (3d Cir. 1994), a police officer attacked an individual, who was his relation by marriage and, of course, therefore knew the officer personally. The officer used his service revolver and police-issued nightstick, id. at 813, yet the court held there was no action under color of state law. Merely because a police officer is recognized as an individual employed as a police officer does not alone transform private acts into acts under color of state law.

Id. at 839.

The court pointed out that Donald Van Ort opened the door without knowing who was there. At trial Donald Van Ort testified that he then recognized Stanewich, who quickly put on a mask and pointed a revolver at him. Id. But, the court explained, Stanewich did not use his authority to gain entry to the home or to induce Donald Van Ort to open his front door. Rather, Stanewich, while wearing his mask, used his gun and physical force to enter the house. Id. Donald Van Ort's cry of "it's a robbery" showed that Donald Van Ort was not under any illusion concerning Stanewich's intentions. Id.

According to the court, the most Donald Van Ort could contend was that his recognition of Stanewich caused him to hesitate and open the door a little further to find out what Stanewich wanted. Id. Based on this, the court stated, Donald Van Ort could argue that Stanewich exerted physical control using his official status, as was done in Vang. Id. The court stated that unlike in Vang, the circumstances in the case before it showed "conjectural, momentary, and de minimis physical control." Id. The court continued:

> The evidence shows that Donald would have opened the door regardless of whether Stanewich was a police officer, and Stanewich did not rely on Donald's recognition to gain

11 - OPINION & ORDER

>       entry; his gun and brute physical violence proved quite
>       sufficient. Moreover, Stanewich did not purport to act
>       under state law. Quite to the contrary, Stanewich, in a
>       matter of moments, made it clear that his actions were
>       illicit. In short, Stanewich exerted no meaningful,
>       physical control over Donald on the basis of his status
>       as a law enforcement officer. Thus, Stanewich's acts
>       were not under color of law.

Id. at 839-40.

Finally, in Traver v. Meshriy, 627 F.2d 934 (9th Cir. 1980), the plaintiff was a customer in a bank who experienced problems making a withdrawal. The exasperated plaintiff believed he had overextended his coffee break from work and announced to bank staff that he would be back in five minutes to get his money. He left his documents in the bank. As he was heading for the exit, the bank teller employee called out to Timothy Gibson, an off-duty San Francisco police officer working as a teller at the bank, "stop that man," or "stop that guy." Id. at 937. Gibson, whose primary responsibility was bank security, pulled his police identification from his wallet and proceeded to the bank exit, intercepting the plaintiff. Id.

Gibson identified himself as a police officer and motioned the plaintiff to a platform in the branch and instructed him to sit down. The plaintiff complied, but at several points inquired about what was going on and protested the detainment. Gibson left his handgun at his teller's station, retrieved it, and then Gibson returned to the plaintiff's location, holding the gun. Although the parties disputed exactly how the gun was held, it was agreed that it was not aimed or cocked. After a few minutes, Gibson stationed himself, this time with his gun, near the bank exit where he had first intercepted plaintiff.

12 - OPINION & ORDER

The bank employee then finished checking the plaintiff's accounts and approved the transaction, giving the plaintiff the $1,000 he sought to withdraw. The plaintiff was held for approximately fifteen to twenty minutes.

The first issue addressed by the Ninth Circuit was whether Gibson acted under color of state law. Gibson's testimony was that he responded to the employee's call to stop the plaintiff as a police officer rather than as a bank teller. Other testimony established that using off-duty police officers as "security tellers" at the bank was part of a police department "secondary hiring" program, and that the police department selected the officers for the program. Id. Additionally, Gibson flashed his police identification at the plaintiff and introduced himself as a police officer before instructing the plaintiff to sit down on the platform. Id. The court concluded that the facts compelled the conclusion that Gibson was acting under color of state law.

These cases, Huffman, Van Ort, and Traver, collectively point to several types of factors relevant to the query of when an off-duty police officer purports or pretends to act pursuant to official authority. First are the indicia of authority such as wearing a uniform, displaying badge, brandishing a weapon, identifying oneself as an officer, issuing commands, or intervening in a dispute. Other considerations may include the officer's role at the time, such as the fact that Gibson was actually hired to perform security under a formal arrangement with the police department. Finally, as explained in Van Ort, while mere recognition as a police officer does not turn private acts into acts under color of state law, there are situations where an

13 - OPINION & ORDER

officer may exert such "meaningful, physical control" over another "on the basis of his status as a law enforcement officer" that the officer's actions may amount to official conduct under color of state law.

Sheffer argues that walking down the sidewalk in her neighborhood, outside the jurisdiction where she is employed, off-duty, and out-of-uniform, and stepping into the street in front of a neighbor's car with no allegation that she flashed a badge or identified herself as a police officer in any way, and then motioning for her neighbor to stop, are not actions taken under color of state law. Furthermore, Sheffer argues that, under Van Ort, simply because plaintiff knew Sheffer to be a Portland police officer does not transform her actions into actions taken under color of state law.

Plaintiff argues that Sheffer acted under pretense of state employment by asserting her state-authorized ability to stop moving vehicles as well as to run license plate searches. Pltf's Mem. at p. 6. Plaintiff argues that it was precisely because Sheffer was "cloaked" in the authority of the state that she had the audacity to walk into a public street and stand in front of a moving vehicle and direct plaintiff to pull over.

Although the issue is close, I agree with defendant. As defendant notes, she was off-duty, out of uniform, and not in her jurisdiction. She did not flash a badge. She did not have a weapon. She did not issue an oral command to stop. She did not identify herself in any way as a police officer. Additionally, her actions were made in the context of what appears to have been a personal dispute between plaintiff and Sheffer. And while

14 - OPINION & ORDER

plaintiff may have known that Sheffer was a police officer, that alone does not cloak Sheffer's actions with official authority. If that were the test, a police officer's every action would be subject to a federal constitutional claim by any family member, neighbor, friend, etc. based only on the status of being in law enforcement. The caselaw does not support such a standard.

The alleged facts which cause a concern regarding Sheffer's possible pretense of authority are the allegations in paragraphs 11 and 12 of the First Amended Complaint in which plaintiff asserts that Sheffer walked in front of his car, directed him to pull over, told him during their exchange that she had previously run his license plate, and directed him not to drive through the public street. First Am. Compl. At ¶¶ 11, 12. Some of these facts (walking in front of the car and directing plaintiff to pull over) raise the question of whether Sheffer exerted "meaningful, physical control" over plaintiff "on the basis" of her "status as a law enforcement" officer. Previously running plaintiff's license plate, because it is expected to be performed only by law enforcement personnel, could suggest that Sheffer was purporting to act officially.

Nonetheless, when all the circumstances of the encounter are considered, these facts fall short of establishing that Sheffer acted under color of state law because they do not imbue her with the required authority given all of the other relevant facts and the lack of any indicia of official conduct. Given the time, place, manner, and context of the encounter, the collective facts do not show that Sheffer invoked her police authority in stopping plaintiff. Thus, I grant defendant's motion. Given my

15 - OPINION & ORDER

disposition, I do not consider defendant's qualified immunity argument. However, because the question is close, I give plaintiff leave to replead the section 1983 claim against Sheffer.

## II. IIED Claim

Sheffer moves to dismiss the IIED claim because the alleged conduct was not "extraordinarily outside the bounds of socially tolerable behavior."

To sustain an IIED claim, plaintiff must show that defendant intended to inflict severe emotional distress, that defendant's acts were the cause of plaintiff's severe emotional distress, and that defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 563, 901 P.2d 841, 849 (1995); see also Babick v. Oregon Arena Corp., 333 Or. 401, 411, 40 P.3d 1059, 1063 (2002) (to state an IIED claim under Oregon law, plaintiff must prove, inter alia, that defendants' actions "constituted an extraordinary transgression of the bounds of socially tolerable conduct.") (internal quotation omitted).

Conduct that is merely "rude, boorish, tyrannical, churlish, and mean" does not support an IIED claim. Patton v. J.C. Penney Co., 301 Or. 117, 124, 719 P.2d 854, 858 (1986). "[T]he tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability." Hall v. The May Dep't Stores Co., 292 Or. 131, 135, 637 P.2d 126, 129 (1981); see also Watte v. Maeyens, 112 Or. App. 234, 237, 828 P.2d 479, 480-81 (1992) (no claim where employer threw a tantrum,

16 - OPINION & ORDER

screaming and yelling at his employees, accused them of being liars and saboteurs, then fired them all); Madani v. Kendall Ford, Inc., 312 Or. 198, 205-06, 818 P.2d 930, 934 (1991) (no claim where employee terminated for refusing to pull down pants).

In a 2008 case, the Oregon Court of Appeals explained the following parameters of the tort:

> A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability. . . .
>
> * * *
>
> The classification of conduct as "extreme and outrageous" depends on both the character and degree of the conduct. As explained in the Restatement at § 46 comment d:
>
>> "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
>
> Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. We consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences.

House v. Hicks, 218 Or. App. 348, 358-60, 179 P.3d 730, 737-39 (2008) (internal quotations and citations omitted).

Sheffer argues that the act of stepping in front of a neighbor's car and motioning for it to stop cannot be characterized as "atrocious" or "utterly intolerable in a civilized community." She contends that in its worst light, it might be rude, or even mean or "tyrannical," but it does not go "beyond the farthest reaches of socially tolerable behavior." Deft's Mem. at p. 10.

Sheffer also relies on a 2008 decision by Judge Ashmanskas in

17 - OPINION & ORDER

which he held that the defendant police officers' alleged conduct in chasing a female bicyclist during the night without properly identifying themselves and pulling her from her house by her hair was not sufficiently outrageous to support the bicyclist's IIED claim. Child v. City of Portland, 547 F. Supp. 2d 1161, 1167-68 (D. Or. 2008). Sheffer argues that if the conduct of those officers did not meet the standard for an IIED claim, then her conduct also does not meet the standard.

Plaintiff notes that the IIED claim is based on Sheffer's cumulative conduct taken as a whole, beginning with the stop and including the LEDS search and her statements regarding plaintiff's purportedly inappropriate interactions with various individuals around the neighborhood, described as a "possible stalking situation." Plaintiff cites to Oregon cases which have allowed an IIED claim based on false statements where the "defamation allegedly was to serve an ulterior purpose or to take advantage of an unusually vulnerable individual." Checkley v. Boyd, 170 Or. App. 721, 727, 14 P.3d 81, 86 (2000); see also Kraemer v. Harding, 159 Or. App. 90, 111, 976 P.2d 1160, 1173-74 (1999) (directed verdict properly denied where defendants accused plaintiff of sexually molesting schoolchildren, but lacked reasonable grounds to believe the charges and instead were trying to force plaintiff's reassignment from their child's bus route); Dalby v. Sisters of Providence, 125 Or. App. 149, 154, 865 P.2d 391 (1993) (reversing dismissal of IIED claim where plaintiff alleged the defendant falsely accused the plaintiff of theft and encouraged a police investigation and arrest in retaliation for the employee's report that the defendant failed to comply with legal requirements in

18 - OPINION & ORDER

keeping drug inventory records).

Additionally, citing House, plaintiff contends that the outrageousness of Sheffer's behavior must be examined in the context of the "special relationship" that exists between a police officer and a citizen. House, 218 Or. App. at 360, 179 P.3d at 737 (most important contextual factor guiding court's classification of conduct as extreme and outrageous is whether a special relationship exists between a plaintiff and a defendant).

While I generally agree with plaintiff's analysis of Oregon law, I grant the motion to dismiss the IIED claim. First, as defendant notes, the First Amended Complaint fails to allege that any of Sheffer's statements about plaintiff were false. Thus, the cases cited by plaintiff are not on point.

Second, the facts alleged here do not rise to the level of "outrageousness" required to sustain an IIED claim in Oregon. In addition to the Watte and Madani cases cited above, Oregon courts have found no IIED claim when a sheriff allegedly mocked plaintiff as mentally ill, accused him of larceny, threatened to imprison him without reason, ridiculed his complaints about neighbors, and caused plaintiff apprehension by unduly delaying him in front of the sheriff's office, Pakos v. Clark, 253 Or. 113, 132, 453 P.2d 682, 691 (1969), or when an employer allegedly publicly reprimanded the employee without reason, had him placed under surveillance, and publicly ridiculed his elimination habits. Snyder v. Sunshine Dairy, 87 Or. App. 215, 217, 742 P.2d 57, 58 (1987). I agree with defendant that the cases establish a very high bar and that the alleged facts do not rise to the level required.

Finally, while House notes that a "government officer-citizen"

19 - OPINION & ORDER

relationship may be a "special" relationship, none of the cases it cites involve a police officer. Even if a police officer-citizen relationship is "special" such that a police officer has a "'greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers[,]'" id. (quoting McGanty, 321 Or. at 547-48, 901 P.2d 841), the problem here is that I have already determined that the facts alleged in the First Amended Complaint do not establish that Sheffer was acting under color of state law and thus, I do not analyze the relationship between Sheffer and plaintiff as one between a police officer and a citizen. I further note that plaintiff himself alleges that Sheffer ran his license plate for her personal reasons and not part of any assigned duty, underscoring the personal nature of the relationship. First Am. Compl. at ¶¶ 18, 19.

## CONCLUSION

Defendant Sheffer's motion to dismiss (#21) is granted. The section 1983 claim is dismissed without prejudice. The IIED claims is dismissed with prejudice. Plaintiff is given leave to file an amended complaint as to the section 1983 claim, within ten (10) days of the date of this Opinion and Order.

IT IS SO ORDERED,

Dated this  5th    day of  November  , 2010.

/s/ Dennis J. Hubel

Dennis James Hubel
United States Magistrate Judge

20 - OPINION & ORDER